2015-1822

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

LG ELECTRONICS, INC.,

Appellant,

v.

TOSHIBA SAMSUNG STORAGE TECHNOLOGY KOREA CORPORATION,

Appellee.

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board, Case No. IPR2014-00204

## RESPONSE BRIEF OF APPELLEE TOSHIBA SAMSUNG STORAGE TECHNOLOGY KOREA CORPORATION

Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
619.699.2700

Brent Yamashita
DLA PIPER LLP (US)
2000 University Avenue
East Palo Alto, CA 94303
650.833.2000

*Attorneys for Appellee Toshiba Samsung Storage Technology Korea Corporation*

## CERTIFICATE OF INTEREST

LG ELECTRONICS, INC. v. TOSHIBA SAMSUNG STORAGE
TECHNOLOGY KOREA CORPORATION
2015-1822

Counsel for Appellee certifies the following:

1.    The full name of every party or amicus represented by me is:

Toshiba Samsung Storage Technology Korea Corporation

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Toshiba Samsung Storage Technology Corporation owns 50.1%, and Optis Company, ltd. owns 49.9%, of the shares of Toshiba Samsung Storage Technology Korea Corporation.  Toshiba Samsung Storage Technology Corporation does not have a parent corporation, and 51% of its shares are owned by Toshiba Corporation and 49% of its shares are owned by Samsung Electronics Co., Ltd.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

DLA Piper LLP (US):  Stanley J. Panikowski, Alan A. Limbach, Brent K. Yamashita

Dated:  January 14, 2016            By: */s/ Stanley J. Panikowski*
                                              Stanley J. Panikowski

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF RELATED CASES ...............................................1

II.   STATEMENT OF THE ISSUES .................................................2

III.  STATEMENT OF THE CASE .....................................................2

    A.    The '126 Patent and Its Invalidated Claims ........................2

    B.    The Invalidating Prior Art ....................................................6

         1.    Kawano ......................................................................7

         2.    Ohata .........................................................................9

         3.    Ozaki .......................................................................10

         4.    The Kulakowski Patent ..........................................11

    C.    The Board's Final Written Decision .................................14

IV.  SUMMARY OF ARGUMENT ...................................................15

V.   ARGUMENT .............................................................................17

    A.    The Board Correctly Construed the Claims. .....................17

         1.    The Board Correctly Construed "First Mode.".......18

         2.    The Board Correctly Construed the "First Mode" and "Second Mode" Limitations as Being Silent on Relative Spare Area Size. ....................................19

    B.    Substantial Evidence Supports the Board's Anticipation Findings. .........................................................................25

    C.    Substantial Evidence and Proper Analysis Support the Board's Obviousness Findings. ........................................30

         1.    The Board Correctly Found Claim 2 Obvious in View of Kawano and Ohata. .....................................30

         2.    The Board Correctly Found Claim 6 Obvious in View of Kawano and Ozaki. .....................................35

         3.    The Board Correctly Found Claim 9 Obvious in View of Kawano and Kulakowski. ..........................38

- i -

# TABLE OF CONTENTS
## (continued)

**Page**

4.     The Board Correctly Found Claims 10, 11, 13, and 14
Obvious in View of Kawano, Ohata, and Kulakowski............39

VI.     CONCLUSION................................................................................40

# TABLE OF AUTHORITIES

**Page**

CASES

*Cadence Pharm. Inc. v. Exela PharmSci Inc.*,
  780 F.3d 1364 (Fed. Cir. 2015) ........................................................................21

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014) ........................................................................21

*In re Cuozzo Speed Techs., LLC*,
  793 F.3d 1268 (Fed. Cir. 2015) ........................................................................17

*In re Jolley*,
  308 F.3d 1317 (Fed. Cir. 2002) ........................................................................25

*In re Mouttet*,
  686 F.3d 1322 (Fed. Cir. 2012) ........................................................................25

*In re NTP, Inc.*,
  654 F.3d 1279 (Fed. Cir. 2011) ........................................................................17

*In re Rambus, Inc.*,
  694 F.3d 42 (Fed. Cir. 2012) ............................................................................25

*In re Van Geuns*,
  988 F.2d 1181 (Fed. Cir. 1993) ........................................................................20

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
  133 F.3d 1473 (Fed. Cir. 1998) ........................................................................19

*Omega Eng'g Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ........................................................................20

*Union Carbide Corp. v. Am. Can Co.*,
  724 F.2d 1567 (Fed. Cir. 1984) ........................................................................34

*Verizon Services Corp. v. Vonage Holdings Corp.*,
  503 F.3d 1295 (Fed. Cir. 2007) ........................................................................22

WEST\267121260.1

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*York Prods., Inc., v. Central Tractor Farm & Family Ctr.*,
  99 F.3d 1568 (Fed. Cir. 1996) ...........................................................................19


**STATUTES**

35 U.S.C. § 102 ...........................................................................14

35 U.S.C. § 102(a) ...........................................................................9, 10

35 U.S.C. § 102(b) ...........................................................................7, 9, 10, 11

35 U.S.C. § 103 ...........................................................................14

WEST\267121260.1

## I. STATEMENT OF RELATED CASES

There have been no prior appeals in or from this proceeding.

The Court's decision in this appeal may directly affect *LG Electronics, Inc. and LG Electronics U.S.A., Inc. v. Toshiba Samsung Storage Technology Corporation and Toshiba Samsung Storage Technology Korea Corporation*, Case No. 1:12-cv-01063 (D. Del.), in which LG has asserted the same patent that was the subject of the IPR decision being appealed.

TSST-K is unaware of any other case that will directly affect or be directly affected by this Court's decision in the pending appeal.

Finally, the Court has designated this appeal as a companion appeal to Appeal No. 15-1823, which is an appeal between the same parties from IPR proceeding No. IPR2014-00205.

WEST\267121260.1

## II.    STATEMENT OF THE ISSUES

1.      Properly applying the broadest reasonable interpretation standard, did the Board correctly decline LG's invitation to read non-existent limitations from exemplary embodiments into claim 1?

2.      Does substantial evidence support the Board's decision invalidating claims 1, 2, 6-11, and 13-14 of U.S. Patent No. 6,477,126 ("the '126 Patent")?

## III.    STATEMENT OF THE CASE

### A.    The '126 Patent and Its Invalidated Claims

Optical discs, such as CDs and DVDs, can degrade over time or become scratched.  This degradation will generate errors in the recording and/or playback of information.  JA00052 at 1:11-23.  The area where degradation occurs is called a defect area.  *Id.* at 1:24-26.  One common mechanism for handling degradation is to record data in a spare area instead of the defect area.  *Id.* at 1:33-51.

The '126 Patent discloses two modes for providing a spare area for an optical disc:  a first mode and a second mode.  JA00053 at 4:14-27, 4:56-67.

- 2 -

In the first mode, the disc is configured with a primary spare area (sometimes referred to as "PSA" in the patent) and a supplementary spare area (sometimes referred to as "SA-sup" in the patent).  JA00053 at 4:14-27, 4:56-67. An example of the first mode is illustrated in Figure 4B of the '126 Patent:



JA00049 at Figure 4B.

In the second mode, the disc is configured with only a primary spare area. JA00053 at 4:14-27, 4:56-67.  Figure 6 of the '126 Patent illustrates an example of both the first and second modes of assigning spare areas during formatting:



FIG.6

JA00051 at Figure 6.

Figure 5 of the '126 Patent is a flow chart showing a method of assigning the spare area(s) to an optical recording medium:



JA00050 at Figure 5.

WEST\267121260.1

Independent claim 1 of the '126 Patent is a method claim wherein the first mode and second mode are provided, and the drive assigns the spare area(s) using either the first mode or the second mode.  Claim 1 states:

> A method of assigning a spare area of an optical recording medium having a data area, the method comprising:
>
> providing a first mode in which both a primary spare area and a supplementary spare area are assigned;
>
> providing a second mode in which a primary spare area is assigned; and
>
> assigning the spare area according to one of either the first mode or the second mode when the optical recording medium is formatted.

JA00054 at 5:53-62.

## B.    The Invalidating Prior Art

In its Decision, the Board invoked multiple references to invalidate claims 1, 2, 6-11, and 13-19 of the '126 Patent.  The applicants had not listed the invalidating prior art references (Kawano, Ohata, Ozaki, and Kulakowski) in the references cited in the '126 Patent.  JA00045 at Cover.  Nor did the Examiner consider these references during the prosecution of the '126 Patent.  *Id.*

- 6 -

### 1.    Kawano

Kawano, a Japanese patent application, was published on December 13, 1996.  JA02771 at Cover Page.  This was more than one year before the earliest claimed priority date for the '126 Patent, which is November 20, 1998.  *Id*. Kawano is therefore prior art under 35 U.S.C. § 102(b) (pre-AIA) for the '126 Patent.

Kawano discloses changing the format of an optical disc using different modes.  In a first mode, the disc contains a primary spare area and a supplementary spare area.  In a second mode, the disc contains only a primary spare area. JA02773 at paragraph 0016.  This is identical to the purported invention of the '126 Patent.

WEST\267121260.1

The two modes of Kawano are shown in Figure 5 of Kawano:



(Fig. 5)

JA02775 at Figure 5 [red markings added by TSST-K in Board proceedings].  The

first mode is shown as "Format 1" where the primary spare area is the first "spare

area 13" (at the top of the figure) and the supplementary spare area is the second "spare area 13" (at the bottom of the figure). The second mode is shown as "Format 2" where the primary spare area is the only "spare area 13" (there is no other spare area). Kawano discloses rewriting the format of the recording medium among several format examples to shift various areas, such as the spare area, that have high usage frequencies. JA02771 at Abstract. The purpose of this shifting is to extend the life of the recording medium. *Id.*

### 2. Ohata

Ohata, also a Japanese patent application, was published on January 23, 1998. JA02782 at Cover Page. This was nearly 10 months before the earliest claimed priority date for the '126 Patent. Ohata is therefore prior art under 35 U.S.C. § 102(a) (pre-AIA) for the '126 Patent.

Ohata discusses the configuration of spare areas for optical discs that are operated within a cartridge. JA02782 at Abstract. Ohata notes that if a user removes a disc from a cartridge, the disc is likely to then have more defective areas (due to fingerprints, etc.) than would be the case if the disc had never been removed from the cartridge. JA02784 at paragraphs 0006-0008. Therefore, when a disc is placed into the drive, the system determines if the disc has been removed from the cartridge. JA02785 at paragraph 0024. If it has not been removed, then a primary spare area is assigned. *Id.*

- 9 -

But if it has been removed, a primary spare area and a secondary spare area are assigned. *Id.* Ohata thus discloses the use of a first mode and second mode as claimed in the '126 Patent.

The configuration of the first mode in Ohata is shown in Figure 2 on the left, and the configuration of the second mode is shown in Figure 8 on the right:



JA02787 at Figs. 2 & 8. The configuration of Figure 2 is the same as the configuration of Figure 8, except for the addition of the secondary replacement area (next to the primary replacement area). JA02783 at paragraph 0002; JA02785 at paragraph 0024.

### 3. Ozaki

Ozaki, another Japanese patent application, was published on April 8, 1994. JA02811 at Cover Page. This was more than one year before the earliest claimed priority date for the '126 Patent. Ozaki is therefore prior art under 35 U.S.C. § 102(b) (pre-AIA) for the '126 Patent.

WEST\267121260.1

Ozaki discloses recording a primary spare area in the inner portion of the disc. JA02812 at paragraph 0006. This is shown in Figure 5 (where the spare area is item 20b):



JA02816 at Figure 5.

### 4.    The Kulakowski Patent

The Kulakowski patent issued on August 20, 1996. JA02840 at Cover Page. This was more than one year before the earliest claimed priority date for the '126 Patent. Kulakowski is therefore prior art under 35 U.S.C. § 102(b) (pre-AIA) for the '126 Patent.

- 11 -

Kulakowski discloses the use of supplementary spare areas 170 (reserved areas in each band of data areas 160 that include spare sectors when data cannot be written to defective data areas). JA02844 at 4:29-31, 4:54-65; JA02841 at Figure 3. Figure 3 of Kulakowski illustrates this disclosure:



JA02841 at Figure 3.

Kulakowski also discloses a primary spare area (common overflow reserved area 118, for use as a reserved area should any of the reserved areas 170 fill up or otherwise be unavailable). JA02845 at 6:49-67; JA02842 at Figure 2. Figure 2 of Kulakowski illustrates this disclosure:



FIG. 2

JA02842 at Figure 2.

In Kulakowski, the manufacturer and/or the user can set the size of each reserved area depending upon the particular operating environment and conditions. JA02846 at 7: 8-16. The larger the size of the reserved areas 170, the greater the number of defective sectors that can be tolerated before the disk fails. The smaller the size of the reserved areas 170, the greater the amount of data that can be recorded on the disk. If the manufacturer or user selects a non-zero size of

- 13 -

reserved areas 170, the disk is formatted in the first mode (with both primary and supplementary spare areas 118 and 170 respectively). If the manufacturer or user selects a zero size for reserved areas 170 (to maximize the recording capacity of the disk), then the disk is formatted in the second mode (with only the primary spare area 118). Therefore, the spare area is assigned according to the first or second modes based upon a selection by the user or the manufacturer (i.e., selection of a zero or non-zero size of reserved areas 170).

### C.    The Board's Final Written Decision

On May 28, 2014, the Board instituted IPR on claims 1, 2, 6-11, and 13-19 of the '126 Patent. JA02194. The Board issued its Final Written Decision ("Decision") on March 31, 2015. JA00001. In its Decision, the Board found that all the instituted claims are unpatentable under 35 U.S.C. §§ 102 or 103. JA00002.

The Board invalidated all the instituted claims on the following grounds:

| Reference(s) | Basis | Claims Invalidated |
|---|---|---|
| Kawano | § 102 | 1, 7, 8, [15, 19] |
| Kawano and Ohata | § 103 | 2 |
| Kawano and Ozaki | § 103 | 6, [18] |
| Kawano and Kulakowski | § 103 | 9, [16] |
| Kawano, Ozaki, and Kulakowski | § 103 | 10, 11, 13, 14, [17] |

- 14 -

JA00042-43. LG appealed with respect to claim 1 and the claims that depend from it. JA02618; LG Brief at 2-4, 19. LG did not appeal with respect to independent claim 15 and the claims that depend from it. The non-appealed claims (claims 15-19) are denoted in brackets in the above table.

## IV.    SUMMARY OF ARGUMENT

The Board correctly construed the claims, and substantial evidence supports its anticipation and obviousness findings. The Decision thus should be affirmed in its entirety.

**Claim Construction Issue #1**: The Board correctly construed "first mode" to mean a mode "in which both a primary spare area and a supplementary spare area are assigned." LG's assertion that only a primary spare area is assigned in a first mode contradicts the claim language and specification. Claim 1 includes the limitation "providing a first mode in which both a primary spare area and a supplementary spare area are assigned." The Board's construction mirrors the claim language identically. The specification's disclosures also contradict LG's attempt to rewrite the claims. LG thus has supplied no basis for its extraordinary request to reverse a Board construction that consists of the claim language itself.

**Claim Construction Issue #2**: The Board also correctly rejected LG's attempt to insert a relative spare area size requirement into the construction of the "first mode" and "second mode" limitations of the claims. LG wishes there were a

- 15 -

requirement in claim 1 that the total spare area assigned in the first mode be larger than the total spare area assigned in the second mode. *See, e.g.*, LG Brief at 19. But no such requirement exists. Independent claim 1 does not mention any relative size requirement at all, and none should be read into the claim.

By contrast, some of the dependent claims have relative size limitations with respect to spare areas in the different modes. This further confirms that no relative size limitations are baked into the "first mode" and "second mode" limitations themselves. Claim 1 is silent concerning sizes, and when the applicants wanted to include size-related limitations, they did so expressly in the dependent claims. LG cannot overcome the claim language by picking one aspect of an exemplary embodiment out of the specification and grafting it onto claim limitations that are not constrained by that feature. Further, Plaintiffs try to convert one feature of an exemplary embodiment into a claim limitation while arbitrarily ignoring others. This selective approach further underscores the improper nature of LG's claim construction methodology. The Board properly declined to read *any* limitation from the exemplary embodiments into the claims, including the one LG selected, especially in light of the broadest reasonable interpretation standard.

**Anticipation:** LG's primary challenge to the Board's anticipation findings consists of its second claim construction argument above. That argument fails for the same reasons as the claim construction argument itself. LG's backup argument

- 16 -

fares no better because substantial evidence supports the Board's anticipation findings under the Board's construction.

**Obviousness:**  LG's assortment of challenges to the Board's well-supported and well-reasoned obviousness findings also fail for the reasons given in the argument section below.

The Board correctly construed the claims and substantial evidence supports its findings that all the instituted claims are unpatentable.  The Decision thus should be affirmed.

## V.    ARGUMENT

### A.    The Board Correctly Construed the Claims.

LG challenges two aspects of the Board's claim construction.  Both challenges involve LG's attempts to inject into the claims limitations that neither the claim language nor the specification can support.  The "broadest reasonable interpretation" standard governs the Board's constructions.  *See In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1276-79 (Fed. Cir. 2015).  Under this standard, the Board gives claims their broadest reasonable interpretation consistent with the specification.  *Id.*  Accordingly, while the Court reviews the Board's claim constructions *de novo*, the question is whether the Board's constructions were *reasonable*.  *See In re NTP, Inc.*, 654 F.3d 1279, 1287 (Fed. Cir. 2011).  Here, the

- 17 -

Board's constructions—which would be correct under any standard—easily qualify as the broadest reasonable interpretations.

### 1.    The Board Correctly Construed "First Mode."

LG first asks this Court to reverse a construction that comes verbatim from the claim language. The Board construed "first mode" to mean a mode "in which both a primary spare area and a supplementary spare area are assigned." JA00014. Claim 1 includes the limitation "providing a first mode *in which both a primary spare area and a supplementary spare area are assigned*." JA00054 at 5:53-62, emphasis added. The claim language alone refutes LG's attempt to redraft the first mode as one in which only a primary spare area is assigned.

The sole support that LG invokes for its proposed construction does not even describe an embodiment of the invention, much less overcome the actual claim language. LG Brief at 29-30. LG points only to a statement in the "Discussion of Related Art" in the "BACKGROUND OF THE INVENTION" section of the '126 Patent that discusses conventional modes of operation. LG Brief at 29, citing JA00052 at 2:41-46 and related Figures 3A & 3B (which are labeled "Background Art"). This statement uses the terms "first mode" and "second mode" merely to demonstrate a point concerning this related art. JA00052 at 2:41-54. Nothing in the patent suggests that this statement about Figures 3A and 3B is being used to define "first mode" and "second mode" in the context of the claims. Instead, as

- 18 -

shown above, the claims themselves define "first mode" and "second mode."  LG has not shown why features of conventional modes of operation should be read into the claims.  LG thus has no basis for its invitation to rewrite claim 1.

> ### 2.  The Board Correctly Construed the "First Mode" and "Second Mode" Limitations as Being Silent on Relative Spare Area Size.

The Board also correctly rejected LG's attempt to insert a relative size requirement into the construction of the "first mode" and "second mode" limitations of the claims.  LG wants the total spare area assigned in the first mode to be larger than the total spare area assigned in the second mode.  *See, e.g.*, LG Brief at 19, 36.  But these limitations do not contain any relative size requirement.  Rather, when the applicants wanted to claim any particular relative sizes, they did so expressly in the dependent claims.  LG's argument fails for multiple reasons.

*First,* the applicants did not act as a lexicographers with respect to the "first mode" and "second mode" claim terms.  Not even LG alleges they did.  Therefore, the terms receive their ordinary and customary meaning as would be understood by one of ordinary skill in the art.  *See, e.g.*, *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998); *York Prods., Inc., v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1572 (Fed. Cir. 1996).  And LG has pointed to nothing in the ordinary and customary meaning of those claim terms that imposes a relative size requirement.

- 19 -

Rather, claim 1 is silent with respect to any aspect of the relative sizes of spare areas. When the applicants wanted to claim some but not all of the size-related features disclosed in the specification, they did so expressly as additional limitations in the dependent claims. For example, the only limitation that dependent claim 2 adds beyond dependent claim 1 is "wherein sizes of the primary spare area of the first and second modes are equivalent." JA00054 at 5:63-64. By contrast, the applicants did not write any size-related requirement into the "first mode" and "second mode" limitations of claim 1, from which all claims at issue on appeal depend. And it is well-settled that "limitations are not to be read into the claims from the specification." *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993); *see also Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1329-30 (Fed. Cir. 2003) (rejecting the importation of a limitation from the specification where the claim language was silent with respect to that feature).

**Second**, the specification does not support reading the relative size limitation into the claims. LG wrongly asserts that the specification "consistently describes" the first mode as having a larger spare area than the second mode. LG Brief at 30-32. In reality, the specification contains multiple references to the first and second modes that relate simply to whether the disk is formatted with one spare area or two spare areas, with no mention of relative spare area sizes. JA00052-53 at 2:62-65, 2:66-3:3, 4:48-55, 4:56-58, 4:61-65. In fact, immediately after each of the

- 20 -

latter two cited excerpts, the specification prefaces its discussion of relative sizes

with: "For example, …." JA00053 at 4:58-61, 4:65-67. Further, Figure 5 of the

'126 Patent shows the selection of the first and second modes, and the resulting

assignment of just the PSA or the assignment of the PSA and SSA, without any

indication of relative size. And as set forth below, even if the specification did

consistently describe the two modes as having a specific relative size feature

(among other features), there are no grounds to read that particular feature (and

that feature alone) into the claims. In these circumstances, unrecited limitations

cannot be read into the claims. *See Cadence Pharm. Inc. v. Exela PharmSci Inc.*,

780 F.3d 1364, 1369 (Fed. Cir. 2015). *See also Ericsson, Inc. v. D-Link Sys., Inc.*,

773 F.3d 1201, 1218 (Fed. Cir. 2014) (refusing to read limitations from the

specification into the claims absent a clear disavowal of claim scope).

   ***Third***, the specification repeatedly makes clear that the exemplary

embodiments do not limit the scope of the claims. The applicants specifically

stated: "The foregoing embodiments are merely exemplary and are not to be

construed as limiting the present invention. … The description of the present

invention is intended to be illustrative, and not to limit the scope of the claims."

JA00054 at 5:44-49. Accordingly, the specification itself rejects LG's notion that

certain aspects of exemplary embodiments should be imported into claim

limitations that are entirely silent on relative spare area sizes. It is improper to read

- 21 -

such "exemplary" details into the claims, and the Board correctly declined to do so. *See Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1302-03 (Fed. Cir. 2007).

The applicants also prefaced an example that assigned particular sizes to the initial user area in the two modes with the disclaimer that "the present invention is not limited to this example."  JA00053 at 4:3-6.  LG's assertion that "[a] common sense reading" of the disclaimer is that it refers solely to the 120mm size of the disc is unsupported.  LG Brief at 33-34.  In fact, a more natural, contextual reading is that "this example" refers to the explanation that follows, which provides further details of the example.  JA00053 at 4:3-36.  At best, the reference to "this example" in the specification is ambiguous and thus cannot be the type of clear disclaimer that can limit the plain claim language, especially under the broadest reasonable interpretation standard.

**Fourth**, LG cannot justify its selection of just one feature of some exemplary embodiments to wedge into the claims while arbitrarily ignoring others. For example, the specification states:  "The disc will be considered to be in a first mode when the initial user area is less than 4.7GB and in a second mode when the initial user area is equal to 4.7GB."  JA00053 at 4:11-14.  Yet LG does not try to read these relative initial user area sizes into the claims.  Instead, LG cherry-picks

- 22 -

a different unclaimed size feature of the first and second modes (different overall spare area sizes) to read into the claims in a futile attempt to escape anticipation.

By way of further example, LG argued to the Board that Figures 4B and 6 are the only figures that show the claimed first and second modes. JA02278-281. But those figures illustrate a number of features that LG does not try to read into the claims, such as:

- The primary spare area is the same size in both the first and second modes (a feature recited in dependent claim 2). JA00051 at Figure 6; JA00054 at 5:1-4.

- The primary spare area is located at the top of data area in both modes (a feature recited in dependent claim 6). JA00051 at Figure 6; JA00053 at 4:48-53.

- The supplementary spare area is located at the bottom of the data area (a similar feature, "near" the bottom of the data area, is recited in dependent claim 7). JA00049 at Figure 4B; JA00051 at Figure 6; JA00053 at 4:48-51.

- In the first mode, the supplementary spare area is larger in size than the primary spare area (a size feature not claimed at all). JA00049 at Figure 4B; JA00051 at Figure 6; JA00053 at 4:58-61.

- 23 -

LG left these features of exemplary embodiments alone while trying to insert into claim 1 exemplary Figure 6's feature of a spare area in the first mode that is greater in size than the spare area in the second mode.  JA00051 at Figure 6. Moreover, the inclusion of some of these features in dependent claims underscores the exclusion of the unclaimed features of exemplary embodiments from claim 1. Nothing supports LG's claim construction methodology, much less warrants elevating it over the Board's well-supported construction under the broadest reasonable interpretation standard.

Finally, LG's residual arguments fail to carry the day.  LG criticizes the Board for correctly observing that the specification states that "'if the second mode is selected when formatting a disc … a supplementary spare area may be assigned as necessary when recording or playing back data from a disc.'"  JA00013, quoting '126 Patent at 4:61-65 and also citing '126 Patent at 5:36-39; criticized in LG Brief at 34.  But LG's argument is based on its unsupported premise that the claimed "formatting" can only occur once (i.e., during the initial formatting of a disc).  In fact, the specification itself expressly refutes LG's premise by stating that, even after an initial formatting of a "disc being used," "the assignment of the supplementary spare area can be simply cancelled *through a formatting*."  JA00054 at 5:5-8, emphasis added.  And LG's attack on the Board's correct observation that Figure 5 does not specify any relative spare area size limitation is

also misplaced.  LG Brief at 35, criticizing JA00013.  Figure 5 is simply one of many bricks in the wall confirming that nothing in the specification overrides claim 1's complete silence regarding relative spare area size limitations.

LG's challenge to the Board's construction thus flies in the face of the claim language without aid—much less a clear disclaimer—from the specification.  The Board's construction is reasonable (in fact, it is correct) and thus should be affirmed.

### B. Substantial Evidence Supports the Board's Anticipation Findings.

Anticipation is a fact question reviewed for substantial evidence.  *In re Rambus, Inc.*, 694 F.3d 42, 46 (Fed. Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *In re Mouttet*, 686 F.3d 1322, 1331 (Fed. Cir. 2012).  Even "[i]f the evidence in [the] record will support several reasonable but contradictory conclusions, [this Court] will not find the Board's decision unsupported by substantial evidence simply because the Board chose one conclusion over another plausible alternative."  *In re Jolley*, 308 F.3d 1317, 1320 (Fed. Cir. 2002).

LG's primary challenge to the Board's finding that Kawano anticipates claims 1, 7, and 8 consists of LG's "relative size" claim construction argument that the Board correctly rejected.  LG Brief at 30.  LG's argument was refuted in Section V.A.2 above.

Having failed in its effort to redraft claim 1 of the '126 Patent, LG then tries to rewrite Kawano in an effort to remove it from the scope of the Board's construction.  Specifically, LG mischaracterizes Kawano's disclosure of modes with a single spare area as somehow showing two spare areas.  LG Brief at 37-40.  Substantial evidence supports the Board's finding that Kawano discloses modes with a single spare area (i.e., the second mode claimed in the '126 Patent).

WEST\267121260.1

LG's argument is based entirely on its own annotation of Formats 2 and 3 of Figure 5 of Kawano to divide the spare area in each of those formats into *two* spare areas.  LG Brief at 39.  Kawano's actual Figure 5 does not contain these annotations, but instead shows a single spare area in each of Formats 2 and 3:



(Fig. 5)

JA02775 at Figure 5.

Kawano thus discloses:  (1) two spare areas in Format 1 (corresponding to the claimed "first mode" of the '126 Patent); and (2) one spare area in Formats 2 and 3 (corresponding to the claimed "second mode" of the '126 Patent).  JA02775 at Figure 5.  The text of Kawano also underscores what is evident from Figure 5.  In describing Format 1, Kawano uses the plural in stating:  "In format 1, the *spare areas* are 0-99,999 and 900,000-1,000,000 …."  JA02773.  In describing Formats 2 and 3, Kawano uses the singular in stating:  "[I]n format 2, the head address of the *spare area* is started from 300,000 and in format 3 *it* is started from 700,000 …."  JA02773.

 In a last-ditch effort to justify its modification of Kawano, LG posits an inconsistency between the Board's interpretation of Figure 4A of the '126 Patent and Kawano.  LG Brief at 39-40, discussing JA00008.  But the Board's interpretation of Figure 4A of the '126 Patent—which has different labels and different text describing its meaning than Figure 5 of Kawano—is irrelevant to the clear disclosure of Kawano.  LG's assertion that "[t]hat same logic applies equally to Kawano" (LG Brief at 40) is itself illogical.  Whatever the meaning of Figure 4A of the '126 Patent (and its ambiguity further confirms that any limitations it might suggest should not be read into the claims), Kawano itself discloses two "spare areas" for Format 1 and one "spare area" for Formats 2 and 3.  JA02773; JA02775 at Figure 5.

LG suggests that Kawano Formats 2 and 3 depict two adjacent spare areas (rather than the single spare area shown by Kawano Figure 5 and its supporting text) because the content of the spare areas in Format 1 were shifted to a different physical address in Formats 2 and 3.  LG Brief at 38 n.5.  First, this argument (that Formats 2 and 3 of Kawano disclose two adjacent spare areas instead of just one) was not raised by LG before the Board, and thus was waived.  In fact, this argument directly contradicts LG's original position before the Board, where it argued that Kawano only discloses a single spare area that is shifted in location.  JA02287-2290.  Second, Kawano does not define the number of spare areas in a given format based on whether that content had previously been spread across multiple spare areas.  Rather, Kawano defines the number of spare areas in a given format based simply on the number of spare areas in a given format.  JA02773 and JA02775 at Figure 5.  Moreover, nothing in the '126 Patent suggests that a single spare area must be deemed to be two separate but adjacent spare areas because the content originated from two non-adjacent spare areas.  At bottom, therefore, LG's arguments represents yet another improper attempt to add non-existent limitations to the '126 Patent's claims (this time based on the content of the spare areas).

In sum, nothing in Kawano supports LG's artificial attempt to divide unitary spare areas into two separate spare areas.  In fact, Kawano contradicts LG's theory.  Substantial evidence thus supports the Board's anticipation findings.

## C.    Substantial Evidence and Proper Analysis Support the Board's Obviousness Findings.

LG also raises a variety of challenges to the Board's obviousness findings

that LG tries to cloak in the mantle of legal error.  But LG's arguments are really

just objections to the Board's factual findings, and substantial evidence supports

those findings.  In any event, however they are characterized, the portions of the

Decision invalidating claims 2, 6, 9-11, 13, and 14 are correct and should be

affirmed.

### 1.    The Board Correctly Found Claim 2 Obvious in View of Kawano and Ohata.

LG's challenges to the Board's obviousness finding for claim 2 fail for

multiple reasons.

Contrary to LG's principal contention, Ohata does not teach away from the

claimed invention.  *See* LG Brief at 42-47.  It is undisputed that Ohata discloses

two disc formats, one in which both a PSA and an SSA are assigned (Figure 2) and

a second in which just a PSA is assigned (Figure 8), where the PSAs in both

formats are equal in size.  JA02787 at Figs. 2 & 8.  Ohata thus supplies dependent

claim 2's additional requirement that the primary spare areas in both modes be

equivalent in size.  LG asserts that Ohata's contribution should be disqualified

because it discloses adding the SSA through "replacement area processing" *after*

"formatting/initialization."  But the manner in which Ohata formats its disks with

- 30 -

the disclosed spare area assignments is irrelevant to whether it would be obvious to modify Kawano with Ohata's relative spare area size assignments. Ohata's contribution to the obviousness analysis consists of its disc formats, not how those formats are implemented. Accordingly, Ohata does not teach away from the combination that invalidates claim 2.

Further, even if the manner in which Ohata implements its disc formats were relevant, "replacement area processing" is in fact "formatting." The claims of the '126 Patent are directed to spare area assignments "when the optical recording medium is formatted"—not during "initialization" or "initial formatting," as LG argues. The claims of the '126 Patent also define modes in which spare areas are assigned. But the claims contain no limitation that the assignments be simultaneous, and LG identifies none.

In addition, LG's arguments regarding Ohata's replacement area processing contradict the '126 Patent. The '126 Patent discloses subsequent mode conversion (after the first/second mode formatting) by adding or removing the SSA, akin to Ohata's "replacement area processing," where the supplementary spare area "can be simply canceled through *a formatting* as shown in Fig. 6." JA00054 at 5: 5-8, emphasis added. This language makes it clear that "formatted" in the claims is not limited to "initialization" or "initial formatting," as LG argues, and does not

- 31 -

require simultaneous assignments.  Therefore, Ohata does not teach away from being combined with Kawano.

LG is also wrong in asserting that Ohata is somehow distinguishable because it adds the SSA adjacent to the PSA.  Because no limitation in the claims of the '126 Patent requires the two areas to be spaced apart from each other, LG's argument is irrelevant.  The Board's construction correctly requires that the SSA merely be separate from the PSA—i.e., distinct, but not necessarily with other space in between them.

LG also wrongly argues it would not be obvious to modify Kawano with primary spare areas of equal size in multiple formats because one could no longer merely shift the locations of the areas to reduce complexity because the spare area would no longer be the same size in "Format 1" and "Format 2."  To the contrary, making the primary spare area size in Formats 2 and 3 the same as that in Format 1 enables the same shifting—with even better wear performance—and would reduce complexity.  *See, e.g.*, JA02087-88; JA02451-53; JA02862-63 (TSST-K's expert's declaration).

- 32 -

Modifying Figure 5 of Kawano with the teaching of Ohata illustrates this

point:



Fig. 5 (annotated by Petitioner)

Fig. 5 (annotated and modified by Petitioner)

The left version of Figure 5 is annotated to show the high use managing

areas (red boxes) being shifted for wear leveling.  The managing areas in Formats

1 and 3 (the green boxes) partially overlap at the top and bottom.  Therefore, while

Kawano discloses reducing uneven wear, the formats of Figure 5 do not eliminate

it.  A skilled artisan could then make the PSA size in Formats 2 and 3 equal to the

PSA size in Format 1 (as taught by Ohata), as shown in annotated and altered

Figure 5 of Kawano on the right.  This configuration maintains the same shifting

technique (resulting in even better wear performance with no overlap of the high

- 33 -

use management areas), and it reduces complexity because there would never be a need to move data in the PSA of Format 1 to any area other than the PSA of Formats 2 and 3 because they are all the same size. *See, e.g.*, JA02087-88; JA02451-53; JA02862-63 (TSST-K's expert's declaration).

Therefore, combining Ohata with Kawano to make the PSA the same size in both modes does reduce complexity and maintain the wear shifting of Kawano. In fact, there are only three possibilities for the first mode PSA size relative to the second mode PSA size: equal, greater, or less. Contrary to LG's argument (LG Brief at 49), choosing one over another is an obvious design choice with predictable results.

LG's criticism of the use of the annotated and modified version of Kawano Figure 5 above as "attorney argument" is misplaced. *See* LG Brief at 48-49. This exhibit simply helps illustrate why the combination would be obvious. That conclusion is in turn supported by the evidence in the record, most notably the prior art references themselves. *See Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567, 1573 (Fed. Cir. 1984) ("[T]he references and appellant's invention are easily understandable without the need for expert explanatory testimony."); *see also* JA02861-63 (TSST-K's expert's opinion that claim 2 is rendered obvious).

- 34 -

Finally, contrary to LG's assertion, the fact that Ohata involves cartridges does not make its teachings unsuitable for combination with Kawano. *See* LG Brief at 47-48. Kawano involves defects on a rewritable recording media, which includes magneto-optical disks and the like. JA02772 at paragraph 0002. Ohata discloses how to deal with defects after a disk has been exposed (i.e., removed from the cartridge). JA02782, at Abstract. Ohata thus discloses a defect management solution in circumstances where the Ohata disk is placed in the same environmental condition as the Kawano disk (i.e., not protected by a cartridge). Accordingly, LG is wrong in contending that Ohata is inextricably linked to "disks *in* cartridges." LG Brief at 47. Rather, one working with cartridge-less disks would look to Ohata's solution when the disk is removed from the cartridge because that disk would then be exposed to the same causes and risks of damage as the Kawano disk.

### 2. The Board Correctly Found Claim 6 Obvious in View of Kawano and Ozaki.

LG contests the obviousness finding on claim 6—which additionally requires that PSAs in both modes be at the top of the data area—based on the flawed premises that the combination would not have been selected and would not have worked. LG Brief at 50-54. Kawano disclosed incomplete shifting (there is some overlap between the management areas of Formats 1 and 3), and varying the amount of shift. Specifically, moving from Formats 1 to 2, and 2 to 3, involve a

- 35 -

4M address unit shift (address 900K to 300K, and address 300K to 700K).

However, moving from Format 3 to 1 involves only a 2M address unit shift (700K to 900K).  JA02775 at Figure 5.  Therefore, it would have been a mere matter of design choice to change the amount of shift between formats and/or the number of formats used, to place the PSAs in both the first and second modes at the top of the data area as taught by Ozaki as part of a shift implementation involving more than three formats.

For example, merely reducing the 4M address unit shift to 1M results in the following three formats:



JA02775 at Figure 5 as annotated and modified by Petitioner.

Here, Format 1 has two spare areas (primary and supplementary) and Format 2 has only one spare area (i.e. primary). The PSAs in Formats 1 and 2 are both at the top of the data area. Therefore, merely changing the shift increment as a matter of design choice and in light of Ozaki so that two different modes maintain the PSAs at the top of the data area does not result in only one mode of assignment. Nor does it fail to shift these areas integrally with the management area or change the principle operation of Kawano, as LG contends. Rather, Ozaki is simply used to show that the PSA can be at the top of the data in one format, and Kawano's shifting disclosure is not limited by its combination with Ozaki.

LG's argument that Kawano only discloses a solution akin to pure crop rotation, in which the shift in location always must entirely avoid the previous format is wrong. LG Brief at 51. For example, in the shifting shown in Fig. 5, when moving from Format 3 to Format 1, the shifted high use management area portions of these formats overlap at areas 900K-1000K and 000K-100K. In fact, in the shifting scheme of Fig. 4, the spare areas always overlap.

LG also argues that the reduction of the shift to 1M results in "egregious" overlaps of high rewrite frequency areas. As stated above, that also occurs in the shift of Fig. 5. Moreover, the fallacy of this argument is that it is premised on the notation that there can only be three formats total. However, continued shifting at

- 37 -

the 1M address rate will eventually result in perfect wear leveling.  LG's

arguments are directly contradicted by the express teaching of Kawano.

LG's criticism that TSST-K made these arguments in its reply brief without

expert testimony is also misplaced.  *See* LG Brief at 50.  TSST-K made this

argument in response to LG's unfounded position that wear shifting could not be

implemented with minor changes.  And expert testimony was not required to show

that this allegation was false.  TSST-K's arguments were directly based on the

indisputable teachings of Kawano and Ohata, along with expert opinion that claim

6 is rendered obvious by these references.  *See* JA02866-67 (TSST-K's expert

opinion that claim 6 is rendered obvious); *see also* JA02454-55.

### 3. The Board Correctly Found Claim 9 Obvious in View of Kawano and Kulakowski.

For claim 9, LG wrongly argues that when Kulakowski discloses allowing

the user or manufacturer to select the size of the reserved areas 170, it would not

have been obvious for the user or manufacturer to select a zero size to maximize

the recording capacity of the disk.  *See* LG Brief at 54-56.  Before the Board, LG's

sole citation to Kulakowski's allegedly teaching away from selecting a zero size

refers to a default number that can be provided where the user is given the option

to double or triple it.  That default number, however, is an alternative to just

allowing the user or manufacturer to select any number.  *See* JA02846 at 7:8-27

(where LG left off the word "Alternately" at the beginning of the quotation).  Zero

- 38 -

is not only a number, but the obvious number selection to maximize recording capacity.  LG now argues that reserved areas 170 are needed because they provide an area in each band for calibration and defect management.  LG Brief at 55-56.  Yet LG cites to no disclosure in Kulakowski that the reserved areas 170 are necessary for operation, or that the user/manufacturer would or should be prevented from selecting a zero size when trying to maximize data storage capacity when balanced against the known trade off of reduced reliability.  *See also* JA02867-69 (TSST-K's expert opinion that claim 9 is rendered obvious because a user or manufacturer could set the reserved area to zero to maximize storage capacity); JA02457.

### 4.   The Board Correctly Found Claims 10, 11, 13, and 14 Obvious in View of Kawano, Ohata, and Kulakowski.

LG's arguments on claims 10, 11, 13, and 14 merely duplicate arguments already refuted above.  LG Brief at 56; *see also* JA36 (Board's Decision).  Accordingly, the Board's obviousness findings should be affirmed in their entirety.  LG's insistence that they be repeated verbatim lacks merit.

## VI.    CONCLUSION

The Board correctly construed the claims, and substantial evidence supports

its Decision invalidating claims 1, 2, 6-11, and 13-14 of the '126 Patent.

Therefore, the Decision should be affirmed.

Respectfully submitted,

Dated:  January 14, 2016

By: */s/ Stanley J. Panikowski*

Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA  92101-4297
619.699.2700

*Attorneys for Appellee*
*Toshiba Samsung Storage*
*Technology Korea Corporation*

- 40 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 14, 2016, I electronically filed the foregoing

RESPONSE BRIEF OF APPELLEE TOSHIBA SAMSUNG STORAGE

TECHNOLOGY KOREA CORPORATION with the Court's CM/ECF filing

system, which constitutes service, pursuant to Fed. R. App. P. 25(c), Fed. R. Civ.

R. 25(a), and the Court's Administrative Order Regarding Electronic Case Filing

6(A) (May 17, 2012).

*/s/ Stanley J. Panikowski*
Stanley J. Panikowski
DLA Piper LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
Tel: 619.699.2700

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).  The brief contains 6,796 words, as calculated by the word count of the word processing system used in preparing it, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed Cir. R. 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  The brief has been prepared in Microsoft Word 2010 in Times New Roman 14 point font.

*/s/ Stanley J. Panikowski*
Stanley J. Panikowski
DLA Piper LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
Tel: 619.699.2700